**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

| | |
|---|---|
| **IN RE: DEPO-PROVERA (DEPOT MEDROXYPROGESTERONE ACETATE) PRODUCTS LIABILITY LITIGATION**<br><br>This Document Relates to:<br><br>**FELICIA LYNN GUEL,**<br><br>Plaintiff,<br><br>vs.<br><br>**PFIZER INC.; PHARMACIA & UPJOHN CO. LLC; and PHARMACIA LLC,**<br><br>Defendants. | MDL Case No. 3:25-md-3140<br>Individual Case No. 3:26-CV-4761<br><br>Judge M. Casey Rodgers<br>Magistrate Judge Hope T. Cannon<br><br>Designated Forum: U.S. District Court for the Northern District of Texas – Dallas Division<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

## ORIGINAL COMPLAINT

Plaintiff Felicia Lynn Guel, by and through Plaintiff's undersigned counsel, brings this civil action against Defendants for personal injuries and damages suffered by Plaintiff, and alleges upon information and belief as follows:

## INTRODUCTION

1. This is an action for damages related to Defendants' wrongful conduct in connection with the development, design, testing, manufacturing, labeling, packaging, promoting, advertising, marketing, distribution, and selling of medroxyprogesterone acetate (hereinafter "MPA"), also known as depot medroxyprogesterone acetate (hereinafter "DMPA"). Defendants' trade name for this prescription drug is Depo-Provera® (hereinafter "Depo-Provera").

2. Defendants manufacture, promote, and sell Depo-Provera as a prescription drug used for contraception or to treat endometriosis, among other indications. Depo-Provera is manufactured as an injection to be administered intramuscularly every three (3) months in either the upper arm or buttocks.

3. Depo-Provera injured Plaintiff Felicia Lynn Guel (hereinafter "Plaintiff") by causing or substantially contributing to the development of an intracranial meningioma, a type of brain tumor, which has caused serious injuries.

4. Defendants knew or should have known for decades that Depo-Provera, when administered and prescribed as intended, can cause, or substantially contribute to the development of meningiomas.

5. Several scientific studies have established that progesterone, its synthetic analogue progestin, and Depo-Provera in particular, cause or substantially contribute to the development of intracranial meningioma, a type of brain tumor.

6. Nevertheless, Defendants failed to warn, instruct, advise, educate, or otherwise inform Depo-Provera users and prescribers about the risk of intracranial meningioma or the need for monitoring for resultant symptoms.

7. To date, the U.S. label for Depo-Provera still makes no mention of the increased risk to patients of developing intracranial meningiomas despite the fact that the European Union (EU) and the United Kingdom labels now list meningioma under the "special warnings and precautions for use" section and advise EU patients to speak with their doctors before using Depo-Provera if they have any history of meningioma.

8. Moreover, the Canadian label for Depo-Provera has listed "meningioma" among its "Post-Market Adverse Drug Reactions" since at least 2015.

9. As a proximate result of Defendants' wrongful actions and inactions, Plaintiff was injured and suffered damages from Plaintiff's use of Depo-Provera.

10. Plaintiff therefore demands judgment against Defendants and requests, among other things, compensatory damages, exemplary damages, attorneys' fees, and costs.

## PARTIES

11. At all relevant times hereto, Plaintiff Felicia Lynn Guel was and is a resident and citizen of Dallas, Dallas County, Texas.

12. Defendant PFIZER INC. (hereinafter "Pfizer") is a corporation organized under Delaware law with its principal place of business at The Spiral, 66 Hudson Boulevard East, New York, NY 10001.

13. Pfizer is registered to do business in the State of Texas and has a registered agent for service of process, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

14. Defendant PHARMACIA & UPJOHN CO. LLC (hereinafter "Pharmacia & Upjohn" or "Upjohn") is or was a limited liability company organized under Michigan law and headquartered at 7171 Portage Road, Kalamazoo, MI 49002.

15. Pharmacia & Upjohn has a registered agent for service of process, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

16. Defendant PHARMACIA LLC (hereinafter "Pharmacia") is a limited liability company organized under Delaware law and headquartered at Pfizer Peapack Campus, 100 Route 206 North, Peapack, NJ 07977.

17. Pharmacia has a registered agent for service of process, CT Corporation System, at 820 Bear Tavern Road, West Trenton, NJ 08628.

18. Defendant Pfizer is the current New Drug Application (hereinafter "NDA") holder for Depo-Provera and has solely held the NDA for Depo-Provera since 2020. Upon information and belief, Pfizer has effectively held the NDA since at least 2002 when it acquired Pharmacia & Upjohn—who then held the NDA—as a wholly owned subsidiary. No later than 2003 did Pfizer's name appear on the label alongside Pharmacia & Upjohn.

19. At all relevant times, Defendant Pharmacia & Upjohn was a wholly owned subsidiary of Defendant Pfizer until Upjohn was spun off in a merger in 2020 to create non-party Viatris Inc. and the remnant, i.e., Defendant Pharmacia, was retained by Pfizer.

20. All Defendants do business in Texas by, among other things, distributing, marketing, selling, and/or profiting from Depo-Provera in Texas, as well as throughout the United States.

21. At all times material herein, Defendants were, and still are, pharmaceutical companies involved in the manufacturing, research, development, marketing, distribution, sale, and release for use to the general public of pharmaceuticals, including Depo-Provera, in Texas, and throughout the United States.

## JURISDICTION, VENUE, AND DESIGNATED FORUM

22. This action is filed directly in the United States District Court for the Northern District of Florida pursuant to Pretrial Order No. 10 entered in In re: Depo-Provera (Depot Medroxyprogesterone Acetate) Products Liability Litigation, MDL No. 3140.

23. Pursuant to Pretrial Order No. 10, Plaintiff designates the United States District Court for the Northern District of Texas, Dallas Division, as the Designated Forum — that is, the federal district court in which this action would have been filed absent the direct-filing procedures established in this MDL.

24. Plaintiff resides in Dallas County, Texas, which lies within the Dallas Division of the Northern District of Texas. Plaintiff was prescribed and administered Depo-Provera in Texas, and Plaintiff's injuries were sustained, diagnosed, and treated in Texas.

25. Consistent with Pretrial Order No. 10, Plaintiff acknowledges that the direct filing of this action in the Northern District of Florida is for pretrial purposes only, and that upon completion of pretrial proceedings this action shall be transferred to the Designated Forum for trial. Direct filing shall not constitute a waiver of any party's rights with respect to personal jurisdiction, venue, or choice of law, and the law of the Designated Forum shall govern, including its choice-of-law rules.

26. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the Parties are citizens of different States.

27. Plaintiff is a citizen of the State of Texas. No Defendant is a citizen of the State of Texas. Complete diversity of citizenship therefore exists.

28. This Court has supplemental jurisdiction over any remaining common law and state claims pursuant to 28 U.S.C. § 1367.

29. All Defendants regularly conduct business in Texas and are subject to personal jurisdiction in the Designated Forum.

30. Venue would be proper in the Designated Forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim, including the distribution, sale, and administration of Depo-Provera to Plaintiff and Plaintiff's development, diagnosis, and treatment of meningioma, all occurred in the Northern District of Texas.

31. Defendants have purposefully availed themselves of the privilege of conducting business in Texas by, among other things, registering to do business in Texas, maintaining registered agents for service of process in Texas, marketing and promoting Depo-Provera to Texas prescribers and patients, sponsoring continuing medical education directed at Texas health care providers, and deriving substantial revenue from the sale of Depo-Provera in Texas.

32. Upon information and belief, at various points in time Defendant Pfizer sponsored continuing education courses, seminars, and meetings to promote the use of Depo-Provera to health care providers in Texas, including providers within the health system(s) at which Plaintiff received Depo-Provera injections.

33. Upon information and belief, Defendants had contractual and/or sales relationships, directly or through intermediaries, to sell Depo-Provera to health care providers and health systems in Texas, knowing that those providers would be injecting Depo-Provera into Texas patients, including Plaintiff.

## PLAINTIFF FELICIA LYNN GUEL'S SPECIFIC FACTS

34. In or about September 2003, at the age of 23, Plaintiff Felicia Lynn Guel was first administered Depo-Provera for contraception at UT Southwestern Medical Center located in Dallas, Texas.

35. At all times relevant herein, Defendants represented Depo-Provera to be appropriate, safe, and suitable for such purposes through the label, packaging, patient inserts, and advertising.

36. Plaintiff periodically received Depo-Provera injections pursuant to her physicians' prescriptions from September 2003 through December 3, 2025, receiving approximately four shots per year for over 22 years.

37. Upon information and belief, the Depo-Provera administered to Plaintiff was designed, manufactured, labeled, marketed, distributed, and sold by Defendants.

38. Over time, Plaintiff experienced concerning symptoms including severe or migraine headaches, vision changes, blurred or double vision, eye pain, dizziness, cognitive changes, neck pain or stiffness. Following multiple medical visits complaining of these symptoms, at the age of 45 Plaintiff was diagnosed with an intracranial meningioma in 2025.

39. Specifically, in November 2025 Plaintiff underwent a CT scan which revealed an enlargement of a meningioma compressing and encroaching on the optic canal.

40. On December 16, 2025, Plaintiff underwent left frontal orbital zygomatic craniectomy at Medical City Dallas in Dallas, Texas.

41. Plaintiff continues to suffer from headaches, visual deficits, cognitive or memory impairment, fatigue, surgical site complications, and requires ongoing medical treatment and monitoring.

42. As a result of Defendants' actions and inactions, Plaintiff has suffered serious injuries and damages due to Plaintiff's development of an intracranial meningioma.

43. Plaintiff was unaware until December 2025, following publicity associated with a large case-control study in France published in March 2024, that Depo-Provera had any connection to her meningioma.

## GENERAL ALLEGATIONS

### A. Intracranial Meningioma

44. Intracranial meningioma is a medical condition in which a tumor forms in the meninges, the membranous layers surrounding the brain and spinal cord.

45. Although the tumor formed by an intracranial meningioma is typically histologically benign (meaning it usually does not metastasize), the growing tumor can nevertheless press against the sensitive surrounding tissues, i.e., the brain, and thereby cause a number of severe and debilitating symptoms ranging from seizures and vision problems to weakness, difficulty speaking, and even death, among others. Moreover, a sizeable number of meningiomas become atypical or malignant, greatly increasing their danger.

46. Treatment of a symptomatic intracranial meningioma typically requires highly invasive brain surgery that involves the removal of a portion of the skull, i.e., a craniotomy, in order to access the brain and meninges. Radiation therapy and chemotherapy may also be required as the sensitive location of the tumor in the brain can render complete removal highly risky and technically difficult.

47. Due to the sensitive location of an intracranial meningioma immediately proximate to critical neurovascular structures and the cortical area, surgery can have severe neurological consequences. Many studies have described the potential for postoperative anxiety and depression and an attendant high intake of sedatives and antidepressants in the postoperative period. Surgery for intracranial meningioma can also lead to seizures requiring medication to treat epilepsy. Moreover, meningiomas related to progesterone-based contraceptives tend to manifest at the base of the skull where removal is even more challenging, further increasing the risks of injuries.

**B. Depo-Provera**

48. Depo-Provera (depot medroxyprogesterone acetate, "DMPA") was first approved by the FDA in 1992 to be used as a contraceptive, and later, with the approval of the Depo-SubQ Provera 104 variant in 2004, as a treatment for endometriosis.

49. Depo-Provera is administered as a contraceptive injection that contains a high dose of progestin, a synthetic progesterone-like hormone that suppresses ovulation.

50. According to a National Health Statistics Report published in December 2023, nearly a quarter (24.5%) of all sexually experienced women in the United States between 2015 and 2019 had ever used Depo-Provera.

51. According to that same report, those proportions increase even further for Hispanic (27.2%) women and Black (41.2%) women who had ever used Depo-Provera.

52. Depo-Provera is a 150 mg/mL dosage of DMPA that is injected every three (3) months into the deep tissue musculature of either the buttocks or the upper arm, with present labelling recommending alternating the injection site at each injection.

53. Defendant Pfizer represents Depo-Provera to be one of the most effective contraceptives in existence. In fact, the Depo-Provera label groups injectable contraceptives like Depo-Provera alongside "Sterilization" as the most effective contraceptive methods resulting in the fewest unintended pregnancies.

54. Among reproductive age women who used any form of contraception from 2017 to 2019, the contraceptive injection was most often used by young women, lower-income women, and Black women.

55. Depo-Provera was first developed by Defendant Upjohn (later acquired by Defendant Pfizer) in the 1950s.

56. Upjohn introduced Depo-Provera as an injectable intramuscular formulation for the treatment of endometrial and renal cancer in 1960.

57. The NDA for Depo-Provera for use as a contraceptive was originally submitted to the FDA by Upjohn in 1967; however, this application was rejected.

58. Upjohn again applied to the FDA for approval to market Depo-Provera as a contraceptive in 1978 but was again rebuffed.

59. Upjohn applied to the FDA for a third time for the approval of Depo-Provera as a contraceptive in 1983, but the FDA once again rejected the application.

60. As early as 1969, Upjohn successfully received approval for Depo-Provera for contraception in international markets, including France.

61. Upjohn's NDA for Depo-Provera for use as a contraceptive was eventually approved by the FDA on or about October 29, 1992.

62. Upjohn merged with Swedish manufacturer Pharmacia AB to form Pharmacia & Upjohn in 1995.

63. Defendant Pfizer acquired Pharmacia & Upjohn in 2002, thereby acquiring the Depo-Provera NDA as well as the associated responsibilities and liabilities stemming from the manufacturing, sale, and marketing of Depo-Provera.

64. Pfizer has effectively held the Depo-Provera NDA since acquiring Pharmacia & Upjohn in 2002, and has solely held the NDA since 2020, when Upjohn was spun off to form non-party Viatris Inc.

65. Throughout the time Defendants marketed both variants of Depo-Provera, Defendants failed to provide adequate warnings to patients and the medical community, including Plaintiff's prescribing physicians, of the risks associated with using the drug.

66. Defendants also failed to adequately test Depo-Provera to investigate the potential for intracranial meningioma.

67. Defendants are also liable for the conduct of their predecessors who failed to adequately design, test, and warn of the dangers associated with use of Depo-Provera.

## C. The Dangers of Depo-Provera

68. The association between progesterone and meningioma has been known or knowable for decades, particularly for sophisticated pharmaceutical corporations like Defendants engaging in FDA-required post-market surveillance of their products for potential safety issues. That duty includes an obligation to keep current with emerging relevant literature and, where appropriate, perform their own long-term studies and follow-up research.

69. Since at least 1983, the medical and scientific communities have been aware of the high number of progesterone receptors on meningioma cells, especially relative to estrogen receptors. See Blankenstein, et al., "Presence of progesterone receptors and absence of oestrogen receptors in human intracranial meningioma cytosols," Eur J Cancer & Clin Oncol, Vol. 19, No. 3, pp. 365-70 (1983).

70. This finding was surprising and notable within the medical and scientific communities because it had previously been thought that meningioma cells, like breast cancer cells, would show a preference for estrogen receptors. Researchers publishing in the European Journal of Cancer and Clinical Oncology instead found the opposite, indicating progesterone was involved in the incidence, mediation, and growth rate of meningiomas. This particular study was published nearly a decade before the FDA approved Depo-Provera for contraception in 1992. In those nine (9) years before Depo-Provera was approved for contraception, and in the more than thirty (30) years since, Defendants have seemingly failed to investigate the effect of their high-dose progesterone Depo-Provera on the development of meningioma.

71. Since at least as early as 1989, researchers have also been aware of the relationship between progesterone-inhibiting agents and the growth rate of meningioma. That year, the same authors published a study in the Journal of Steroid Biochemistry entitled "Effect of steroids and

antisteroids on human meningioma cells in primary culture," finding that meningioma cell growth was significantly reduced by exposure to mifepristone, an antiprogesterone agent.

72. Numerous studies published in the decades since have presented similar findings on the negative correlation between progesterone-inhibiting agents and meningioma. See, e.g., Grunberg, et al., "Treatment of unresectable meningiomas with the antiprogesterone agent mifepristone," J Neurosurgery, Vol. 74, No. 6, pp. 861-66 (1991); Matsuda, et al., "Antitumor effects of antiprogesterones on human meningioma cells in vitro and in vivo," J Neurosurgery, Vol. 80, No. 3, pp. 527-34 (1994).

73. Relatedly, a number of studies published in the interim have reported on the positive correlation between a progesterone and/or progestin medication and the incidence and growth rate of meningioma. See, e.g., Gil, et al., Br J Clin Pharmacol, Vol. 72, No. 6, pp. 965-68 (2011); Bernat, et al., Acta Neurochir (Wien), Vol. 157, No. 10, pp. 1741-46 (2015); Kalamarides, et al., World Neurosurg, Vol. 101, pp. 814.e7-e10 (2017).

74. In 2015, a retrospective literature review published in the peer-reviewed journal BioMed Research International by Cossu, et al. surveyed the relevant literature including many of the studies cited above and concluded that mifepristone, an antiprogesterone agent, had a regressive effect on meningioma, meaning it stopped or reversed its growth. Reviewing the Blankenstein studies as well as many others conducted over a span of more than thirty (30) years, the authors concluded that mifepristone competes with progesterone for its receptors on meningioma cells and, by blocking progesterone from binding, stems or even reverses the growth of meningioma.

75. In light of the aforementioned studies, for several decades the manufacturers and sellers of Depo-Provera, Defendants, had an unassignable duty to investigate the foreseeable

potential that a high dose synthetic progesterone delivered in the deep tissue could cause the development or substantially contribute to the growth of meningioma. Defendants were also best positioned to perform such investigations. Had Defendants done so, they would have discovered decades ago that their high dose progestin Depo-Provera was associated with a highly increased risk of meningioma and would have spared Plaintiff and countless others the pain and suffering associated with meningioma. Instead, Defendants did nothing, and therefore willfully failed to apprise the medical community, and the women patients receiving quarterly high dose injections, of this dangerous risk.

76. Indeed, more recently, researchers have found that prolonged use (greater than one year) of progesterone and progestin, and specifically Depo-Provera, is linked to a greater incidence of developing intracranial meningioma, as would be expected based on all the aforementioned studies and recognition of the relationship between dose and duration of use and the development of adverse events well recognized in the fields of pharmacology, toxicology, and medicine.

77. In 2022, an article was published in the journal Endocrinology entitled "Estrogen and Progesterone Therapy and Meningiomas." This retrospective literature review noted that a "dose-dependent relationship" has been established between at least one progestin and the incidence and growth rate of meningioma. The study authors further noted that progesterone-mediated meningiomas appear to be located most often in the anterior and middle base of the skull and are more likely to be multiple and require more intensive treatment.

78. In 2023, researchers reported on a direct link between Depo-Provera and meningioma. That year a case series was published in the Journal of Neurological Surgery Part B: Skull Base titled "Skull Base Meningiomas as Part of a Novel Meningioma Syndrome Associated with Chronic Depot Medroxyprogesterone Acetate Use." The abstract reported on 25 individuals

who developed one or more intracranial meningiomas related to chronic use of Depo-Provera. Of the twenty-five (25) patients, ten (10) were instructed to cease Depo-Provera use, after which five (5) of those patients had clear evidence of tumor shrinkage, leading the authors to conclude that there appears to be a clear progestin meningioma syndrome associated with chronic DMPA use.

79. In 2024, the French National Agency for Medicines and Health Products Safety, along with several French neurosurgeons, epidemiologists, clinicians, and researchers, published a large case-control study in the British Medical Journal (BMJ), one of the premier scientific journals in the world, to assess the risk of intracranial meningioma with the use of numerous progestogens among women in France (hereinafter the "Roland study"). Roland, et al., "Use of progestogens and the risk of intracranial meningioma: national case-control study," BMJ, Vol. 384 (published online Mar. 27, 2024).

80. By way of history, the Roland study noted that concerns over meningiomas associated with high dose progestogen medications resulted in the recent discontinuation of three such medications in France and the EU. Specifically, there were postponements in the prescription of chlormadinone acetate, nomegestrol acetate, and cyproterone acetate, following the French and European recommendations to reduce the risk of meningioma attributable to these progestogens in 2018 and 2019.

81. The study analyzed 18,061 cases of women undergoing surgery for intracranial meningioma between 2009 and 2018. The study found that prolonged use of medroxyprogesterone acetate (Depo-Provera) was found to increase the risk of intracranial meningioma. Specifically, the authors found that prolonged use of Depo-Provera resulted in a 555% increased risk of developing intracranial meningioma. The study authors concluded that the increased risk associated with the use of injectable medroxyprogesterone acetate, a widely used contraceptive,

was an important finding. The authors' also noted Depo-Provera is often administered to vulnerable populations, i.e., lower-income women who have no other choice but to take the subsidized option which only requires action every three months to remain effective for its intended use of preventing pregnancy, and, in the case of the subcutaneous variant, treating endometriosis.

82. The 2024 Roland study published in BMJ studied the effect of several other progestogen-based medications. Three study subjects showed no excess risk of intracranial meningioma surgery with exposure to oral or intravaginal progesterone or percutaneous progesterone, dydrogesterone or spironolactone, while no conclusions could be drawn for two others due to lack of exposed cases. The other medications, including medroxyprogesterone acetate (Depo-Provera), were found to be associated with an increased risk of intracranial meningioma, with Depo-Provera having by far the second highest increased risk, surpassed only by the product cyproterone acetate, which had already been withdrawn from the market due to its association with meningioma.

83. Depo-Provera had by far the highest risk of meningioma surgeries amongst progesterone contraceptive products studied, rendering Depo-Provera more dangerous than other drugs and treatment options designed to prevent pregnancy due to the unreasonably increased risk of injury associated with intracranial meningioma, including but not limited to seizures, vision problems, and even death.

84. Further, the Roland study found the longer duration of exposure had a greater risk, noting the results show that three quarters of the women in the case group who had been exposed for more than a year had been exposed for more than three years.

85. The Roland study noted that among cases of meningioma observed in the study, 28.8% (5,202/18,061) of the women used antiepileptic drugs three years after the index date of intracranial surgery.

86. More recently, in September 2024, an article entitled "The Association between Medroxyprogesterone Acetate Exposure and Meningioma" was published in Cancers. This large case-control study analyzed over 117,000 meningioma cases and more than one million matched controls and found that injection exposure of medroxyprogesterone acetate, i.e., Depo-Provera usage, was associated with a 53% increase in the development of meningioma. The association was specific to cerebral meningiomas and became even stronger with prolonged use.

87. In October 2024, researchers at the University of Cincinnati published an abstract in the International Journal of Radiation Oncology Biology Physics titled "Progesterone Contraception and Tumor-Related Visual Impairment in Premenopausal Women with Meningioma Referred for Radiation." This paper reported on a retrospective case-control study that examined, inter alia, the role of hormonal contraception in the development of intracranial meningioma causing visual impairment in women under the age of 55. The authors concluded that progesterone use is a significant risk factor for meningioma-related visual deficits, with a disproportionate number of affected patients on Depo-Provera specifically.

**D. Defendants' Failure to Test Depo-Provera**

88. Defendants knew or should have known of the potential impact of the drug to cause the development of intracranial meningioma but failed to adequately study these adverse effects.

89. Furthermore, despite the fact that studies have emerged over the course of decades providing evidence of the meningioma-related risks and dangers of progesterone and progestins and Depo-Provera specifically, Defendants have failed to adequately investigate the threat that

Depo-Provera poses to patients' well-being or warn the medical community and patients of the risk of intracranial meningioma and sequelae related thereto.

**E. Defendants' Continuing Failure to Disclose Depo-Provera's Health Risks**

90. According to the Drugs@FDA website, the label for Depo-Provera has been updated on at least thirteen (13) occasions since 2003, with a recent update coming in July 2024. Despite the fact there are at least fourteen (14) iterations of the Depo-Provera label, Defendants' labels have not contained any warning or any information whatsoever on the increased propensity of Depo-Provera to cause severe and debilitating intracranial meningioma like that suffered by Plaintiff.

91. Despite the aforementioned article in the BMJ and all the preceding medical literature cited above demonstrating the biological plausibility of the association between progesterone and meningioma, evidence of Depo-Provera related cases of meningioma, and the evidence of other high dose progesterones causing meningiomas, Defendants have still made no adequate change to the U.S. Depo-Provera label related to intracranial meningioma. Furthermore, Defendants failed to take timely steps to otherwise warn the medical community and Depo-Provera users of these significant health risks, despite changing the label as recently as July 2024 to include warnings about pregnancy-related risks, and despite Defendant Pfizer publicly stating in 2024 that it was aware of the potential risk associated with long-term use of progestogens and was in the process of updating product labels and patient information leaflets.

92. Defendant Pfizer has changed the label in the EU and the UK and potentially in other countries. Specifically, Defendants' Depo-Provera label in the EU now contains an addition under the section titled "Special warnings and precautions for use" advising that meningiomas have been reported following long-term administration of progestogens, including

medroxyprogesterone acetate; that Depo-Provera should be discontinued if a meningioma is diagnosed; and that caution is advised when recommending Depo-Provera to patients with a history of meningioma.

93. Additionally, Defendants' Package Leaflet in the EU, which provides information for the patient, instructs patients to tell their doctor or healthcare professional before using Depo-Provera if they have, or have ever had in the past, a meningioma.

94. Nothing was or is stopping Defendants from adding similar language to the label and package insert for Depo-Provera in the United States. Defendants could have at any time made "moderate changes" to the label.

95. Specifically, Defendants could have filed a "Changes Being Effected" ("CBE") supplement under 21 C.F.R. § 314.70(c) to make "moderate changes" to Depo-Provera's label without any prior FDA approval.

96. Examples of moderate label changes that can be made via a CBE supplement explicitly include changes "to reflect newly acquired information" in order to "add or strengthen a contraindication, warning, precaution, or adverse reaction." 21 C.F.R. § 314.70(c)(6)(iii)(A). By definition and by regulation, such changes to add a warning based on newly acquired information—such as that imparted by newly emerging literature like the litany of studies cited above—are considered a "moderate change."

97. Recently, the Third Circuit reaffirmed the plain-text interpretation of the CBE supplement process in a precedential decision holding that the defendant in that case could not rely on a preemption defense based on an allegedly irreconcilable conflict between federal (FDCA) and state (civil tort) law so long as the warning could have been effected via a CBE change. See In re Fosamax (Alendronate Sodium) Prods. Liab. Litig., 118 F.4th 456 (3d Cir. 2024).

98. Defendants could have also instructed physicians to consider Defendants' own safer alternative design, a lower dose medroxyprogesterone acetate injected subcutaneously instead of the more invasive and painful intramuscular injection method. Studies going back at least ten years have shown that the 150 mg dose of Depo-Provera—when administered subcutaneously, instead of intramuscularly—is absorbed by the body at a similarly slower rate as the lower dose 104 mg Depo-SubQ Provera 104 version and never exceeds more than a small fraction of the dangerously high serum levels seen in the first several days with intramuscular administration of 150 mg Depo-Provera. Nevertheless, Defendants never produced a 150 mg subcutaneous version.

99. Another study published in Contraception: X in 2022 concluded that not only was the lower dose Depo-SubQ Provera 104 just as effective as 150 mg Depo-Provera when administered properly, but it could also be administered every 16 weeks instead of every 12 weeks due to the more gradual uptake of the subcutaneous administration route. That same study found that 150 mg Depo-Provera, if injected subcutaneously, could remain at efficacious levels in the blood for even longer, up to six (6) months.

100. As with subcutaneously administered Depo-SubQ Provera 104, the study authors noted that subcutaneous administration of 150 mg Depo-Provera every six months would be a highly effective repurposing with a similar reduction in cumulative exposure. The authors concluded that the use of an unnecessarily high exposure to limit the residual chance of treatment failure would be a disservice to the vast majority of women if a lower exposure can reduce side effects, costs, or otherwise make the product more acceptable.

101. Despite knowing the subcutaneous administration of 150 mg Depo-Provera would have resulted in much less risk of dangerous side effects like meningioma while providing the same contraceptive efficacy for twice as long (and therefore would have required only half as many

doses of Defendants' product per year), Defendants failed to produce a 150 mg subcutaneous version.

102. Knowing that the lower dose 104 mg Depo-SubQ Provera 104 was equally effective and was easier to administer since it involved a smaller needle being injected only below the skin and not all the way into the muscle, Defendants could have educated the gynecology community that it already had a safer alternative product to 150 mg Depo-Provera, which was more well known to prescribers and patients.

103. In Europe and other countries outside of the United States, this 104 mg subcutaneous dose has a more accessible trade name, "Sayana Press," unlike the unwieldy proprietary developmental name of "Depo-SubQ Provera 104." Sayana Press as sold in Europe may be self-administered by patients, obviating the need for quarterly visits to a medical practitioner.

104. When Depo-SubQ Provera 104, under NDA number 21-583, submitted by Defendant Pharmacia & Upjohn, a subsidiary of Defendant Pfizer, was approved by the FDA on February 17, 2004, those Defendants submitted a proposed trade name that the FDA did not approve, so instead, the proprietary name Depo-SubQ Provera 104 was deemed to be the brand name.

105. Inexplicably, and presumably for commercially beneficial or contractual reasons, Defendant Pfizer made a conscious decision not to seek an alternative, commercially more accessible brand name, and not to endeavor to more vigorously advocate for the sale of Depo-SubQ Provera 104 to patients seeking contraception, despite knowing it had a lower, safer, and effective dosage which would mitigate the potential for adverse reactions engendered by a high dose progestin, including the risk of developing or worsening meningioma tumors.

106. The "lowest effective dose" is a well-known concept in the field of pharmaceutics wherein a drug-maker should seek to find the lowest possible dose at which the drug of interest is efficacious for the intended use, as any additional dosage on top of that lowest effective dose is inherently superfluous and can only increase the risk of unwanted and potentially dangerous side effects while providing no additional efficacy.

107. Either change—adding a warning about the risk of meningioma based on "newly acquired information," or advising physicians to consider a switch to subcutaneous Depo-SubQ Provera 104—either on its own, or taken together, would have constituted a "moderate change" justifying a simple CBE supplement that Defendants could have effectuated immediately and simply notified the FDA thereafter. Yet, Defendants have failed to do so, and that failure continues to date.

108. Defendants ignored reports from patients and health care providers throughout the United States which indicated that Depo-Provera failed to perform as intended. Defendants also knew or should have known of the effects associated with long term use of Depo-Provera, which led to the severe and debilitating injuries suffered by Plaintiff and numerous other patients. Rather than conducting adequate testing to determine the cause of these injuries for which it had notice, or ruling out Depo-Provera's design as the cause of the injuries, Defendants continued to falsely and misleadingly market Depo-Provera as a safe and effective prescription drug for contraception and other indications.

109. Defendants' Depo-Provera was at all times utilized and prescribed in a manner foreseeable to Defendants, as Defendants generated the instructions for use for Plaintiff to receive Depo-Provera injections.

110. Plaintiff and Plaintiff's physicians foreseeably used Depo-Provera, and did not misuse or alter Depo-Provera in an unforeseeable manner.

111. Through its affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff and her physicians the true and significant risks associated with Depo-Provera use.

112. As a result of Defendants' actions, Plaintiff and her physicians were unaware, and could not have reasonably known or have learned through reasonable diligence, that Plaintiff would be exposed to the risks identified in this Complaint and that those risks were the direct and proximate result of Defendants' conduct.

113. As a direct result of being prescribed and administered Depo-Provera, Plaintiff has been permanently and severely injured, having suffered serious consequences.

114. As a direct and proximate result of her Depo-Provera use, Plaintiff suffered severe mental and physical pain and suffering and has sustained permanent injuries and emotional distress, along with economic loss including past and future medical expenses.

## DISCOVERY RULE, FRAUDULENT CONCEALMENT, AND ESTOPPEL

115. Plaintiff's claims are timely. To the extent any applicable limitations period would otherwise bar any claim, that period was deferred, tolled, and/or Defendants are estopped from asserting it, under the Texas discovery rule and the doctrines of fraudulent concealment and equitable estoppel.

116. Plaintiff's injury was inherently undiscoverable and objectively verifiable. The causal connection between Depo-Provera and intracranial meningioma was not knowable to Plaintiff or to Plaintiff's health care providers, because Defendants exclusively possessed and

withheld the information establishing it and omitted any reference to meningioma from the United States label.

117. Defendants willfully, wantonly, and intentionally withheld information from Plaintiff, Plaintiff's healthcare providers, and the general public concerning the known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

118. Defendants willfully, wantonly, and intentionally withheld safety-related warnings from Plaintiff and the general public concerning the known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

119. Defendants willfully, wantonly, and intentionally withheld instructions from Plaintiff and the general public concerning how to identify, mitigate, and/or treat known hazards associated with the use of, and exposure to, Depo-Provera, particularly over extended periods of time.

120. The aforementioned studies reveal that discontinuing use of high dose progesterone and progestin, including Depo-Provera, can retard the growth of meningiomas, yet Defendants failed to warn the medical community and Plaintiff of this method to mitigate the damage of a developing meningioma.

121. Defendants willfully, wantonly, and intentionally ignored relevant safety concerns and deliberately declined to study the long-term safety and efficacy of Depo-Provera, particularly in chronic long-term users of Depo-Provera.

122. Defendants failed to disclose a known defect and, instead, affirmatively misrepresented that Depo-Provera was safe for its intended use. Defendants disseminated labeling, marketing, promotion and/or sales information to Plaintiff, her healthcare providers, and the

general public regarding the safety of Depo-Provera knowing such information was false, misleading, and/or inadequate to warn of the safety risks associated with long-term Depo-Provera use. Defendants did so willfully, wantonly, and with the intent to prevent the dissemination of information known to them concerning Depo-Provera's safety.

123. Further, Defendants actively concealed the true risks associated with the use of Depo-Provera, particularly as they relate to the risk of serious intracranial meningioma, by affirmatively representing in numerous communications disseminated to Plaintiff and her healthcare providers, including without limitation the Package Insert and the Medication Guide, that there were no warnings required to safely prescribe and take Depo-Provera and no intracranial meningioma-related adverse side effects associated with use of Depo-Provera.

124. Due to the absence of any warning by the Defendants as to the significant health and safety risks posed by Depo-Provera, Plaintiff was unaware that Depo-Provera could cause the development of a serious and debilitating intracranial meningioma, as this danger was not known to Plaintiff, Plaintiff's healthcare providers, or the general public.

125. Due to the absence of any instructions for how to identify and/or monitor Depo-Provera patients for potential intracranial meningioma-related complications, Plaintiff was unaware that Depo-Provera could cause serious, intracranial meningioma-related injuries.

126. Despite diligent investigation by Plaintiff into the cause of these injuries, including consultations with medical providers, the nature of Plaintiff's injuries and damages and their relationship to Depo-Provera was not discovered, and through reasonable care and diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims.

127. Given Defendants' conduct and deliberate actions designed to deceive Plaintiff, Plaintiff's healthcare providers, and the general public with respect to the safety and efficacy of Depo-Provera, Defendants are estopped from relying on any statute of limitations defense.

## CONDUCT WARRANTING EXEMPLARY DAMAGES

128. For the reasons set forth above and below, Defendants acted with fraud, malice, and/or gross negligence within the meaning of Tex. Civ. Prac. & Rem. Code § 41.003(a). Defendants' acts and omissions, when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk considering the probability and magnitude of the potential harm to others, and Defendants had actual, subjective awareness of the risk involved but nevertheless proceeded with conscious indifference to the rights, safety, and welfare of others, including Plaintiff.

129. Defendant Pfizer in particular acted with a conscious disregard of the safety of Plaintiff and all the other women, many of whom were young and of lower socioeconomic status, who were subjected to high dose injections of 150 mg Depo-Provera with the known and/or knowable risk of meningioma brain tumors, which risk was generally accepted in the scientific community, while Defendant Pfizer had available its very own safer alternative medication, Depo-SubQ Provera 104. Exemplary damages are warranted to punish and deter Defendants and others from such conduct in the future.

## COUNT I
## STRICT LIABILITY – FAILURE TO WARN

130. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

131. At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition. These actions were under the ultimate control and supervision of Defendants.

132. Defendants, as manufacturers, distributors, and marketers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known based on information that was available and generally accepted in the scientific community that the warnings and other clinically relevant information and data which they distributed regarding the risks associated with the use of Depo-Provera were inadequate.

133. Plaintiff and Plaintiff's treating physicians did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information or data was communicated to Plaintiff or to Plaintiff's treating physicians.

134. Defendants had and continue to have a duty to provide adequate warnings and instructions for Depo-Provera, to use reasonable care to design a product that is not unreasonably dangerous to users, and to adequately understand, test, and monitor their product.

135. Defendants had and continue to have a duty to provide consumers, including Plaintiff and Plaintiff's physicians, with warnings and other clinically relevant information and data generally accepted within the scientific community regarding the risks and dangers associated with Depo-Provera, as it became or could have become available to Defendants.

136. Defendants marketed, promoted, distributed, and sold an unreasonably dangerous and defective prescription drug, Depo-Provera, to health care providers empowered to prescribe and dispense Depo-Provera, and to consumers, including Plaintiff, without adequate warnings and

other clinically relevant information and data regarding the risk of meningioma and the risks of unnecessarily excessive progestin exposure which was available and generally accepted within the scientific community. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Depo-Provera, which resulted in injury to Plaintiff.

137. Defendants knew or should have known through testing, scientific knowledge, advances in the field, published research in major peer-reviewed journals, or otherwise, that Depo-Provera created a risk of developing serious and debilitating intracranial meningioma. At all relevant times, this information was readily available and generally accepted within the scientific community.

138. Despite the fact that Defendants knew or should have known based on information generally accepted within the scientific community that Depo-Provera, with its higher than needed progestin dosage, caused unreasonable and dangerous side effects, they continued to promote and market Depo-Provera without providing adequate clinically relevant information and data or recommending that patients be monitored.

139. Defendants knew that a safer alternative design and product existed, including their own Depo-SubQ Provera 104 which contained substantially less progestin but was equally effective in preventing pregnancy, but failed to warn the medical community and patients about the risks of the high dose which could be mitigated by using the lower dose formulation, Depo-SubQ Provera 104.

140. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

141. The Depo-Provera supplied to Plaintiff by Defendants was defective, unreasonably dangerous, and had inadequate warnings or instructions at the time it was sold, and Defendants also acquired additional knowledge and information confirming the defective and unreasonably dangerous nature of Depo-Provera. Despite this knowledge and information, Defendants failed and neglected to issue adequate warnings that Depo-Provera causes serious and potentially debilitating intracranial meningioma and/or instructions concerning the need for monitoring and potential discontinuation of use of Depo-Provera.

142. Defendants' failure to provide adequate warnings or instructions rendered Depo-Provera unreasonably dangerous in that it failed to perform as safely as an ordinary patient, prescriber, and/or other consumer would expect when used as intended and/or in a manner reasonably foreseeable by the Defendants, and in that the risk of danger outweighs the benefits.

143. Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and Plaintiff's intermediary physicians.

144. Plaintiff's various prescribing physicians, nurse practitioners, physician assistants, and nurses (hereinafter collectively "Plaintiff's Prescribing and Administering Health Care Providers") would not have prescribed and administered Depo-Provera to Plaintiff had they been apprised by Defendants of the unreasonably high risk of meningioma associated with usage of Depo-Provera.

145. Alternatively, even if Defendants had apprised Plaintiff's Prescribing and Administering Health Care Providers of the unreasonably high risk of meningioma associated with usage of Depo-Provera and these providers had still recommended usage of Depo-Provera to Plaintiff, the providers would have relayed the information concerning the risk of meningioma to Plaintiff, along with the alternative treatment of the lower dose subcutaneous Depo-SubQ Provera

104, and Plaintiff as an objectively prudent person would not have chosen to take Depo-Provera, and/or would have opted to take the safer and lower dose Depo-SubQ Provera 104.

146. Similarly, if Defendants had warned of the unreasonably high risk of meningioma associated with the usage of Depo-Provera, and the availability of the safer and equally effective lower dose Depo-SubQ Provera 104, in the Patient Information handout, Plaintiff as an objectively prudent person would not have chosen to take Depo-Provera, and/or would have opted to take the safer, lower, and equally effective dose of Depo-SubQ Provera 104.

147. Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers of the dangerous risks of Depo-Provera including, among other things, the development of intracranial meningioma.

148. Defendants failed to provide adequate post-marketing warnings and instructions after Defendants knew or should have known of the significant risks of, among other things, intracranial meningioma.

149. Defendants continued to aggressively promote and sell Depo-Provera, even after they knew or should have known of the unreasonable risks of intracranial meningioma caused by the drug.

150. To the extent Tex. Civ. Prac. & Rem. Code § 82.007(a) affords Defendants a rebuttable presumption with respect to Plaintiff's failure-to-warn claims, that presumption is rebutted under § 82.007(b), including because Defendants withheld from and/or misrepresented to the United States Food and Drug Administration material information relevant to the association between Depo-Provera and intracranial meningioma, and because Defendants' warnings did not comply with, and were not approved by, the FDA as to the risk at issue. Plaintiff further pleads

that the presumption does not apply to Plaintiff's claims that are not predicated on the adequacy of FDA-approved warnings, including Plaintiff's design defect claims.

151. The foreseeable risk of serious and potentially debilitating intracranial meningioma caused by Depo-Provera could have been reduced or avoided by Plaintiff, prescribers, and/or other consumers had Defendants provided reasonable instructions or warnings of these foreseeable risks of harm.

152. As a direct and proximate result of Defendants' conduct, including the inadequate warnings, dilution or lack of information, lack of adequate testing and research, and the defective and dangerous nature of Depo-Provera, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money and other economic losses, and aggravation of previously existing conditions. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT II
## STRICT LIABILITY – DESIGN DEFECT

153. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

154. At all times material herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera and placed Depo-Provera into the stream of commerce in a defective and unreasonably dangerous condition.

155. Defendants, as manufacturers, designers, distributors, and marketers of pharmaceutical drugs, had a duty to design a product free from a defective condition that was unreasonably dangerous to Plaintiff.

156. Depo-Provera was designed in such a way, using such a high dose of progesterone not necessary for effective contraception, that it posed an unreasonable risk of intracranial meningioma, and Defendants placed and kept Depo-Provera on the market despite Depo-Provera being in a defective condition.

157. Pursuant to Tex. Civ. Prac. & Rem. Code § 82.005, there existed at the time Depo-Provera left Defendants' control a safer alternative design that would have prevented or significantly reduced the risk of Plaintiff's injury without substantially impairing the product's utility, and that was economically and technologically feasible at the time the product left Defendants' control by the application of existing or reasonably achievable scientific knowledge.

158. Depo-SubQ Provera 104 is a lower dosage version of Depo-Provera that contains 104 mg / 0.65 mL and is injected subcutaneously every three (3) months. According to the label, Depo-SubQ Provera 104 can be used for both contraception and treatment of endometriosis.

159. Depo-SubQ Provera 104 never attained meaningful market share, and Defendants failed to promote the product to the medical community as a safer and equally effective method of contraception for women choosing to receive quarterly injections.

160. Defendants failed to promote and encourage conversion of the prescribing gynecological community to Depo-SubQ Provera 104, fearing that doing so could instill a concern of safety as to the risks of their high dose progesterone long-standing product, Depo-Provera.

161. It has long been a tenet in the medical and toxicological community that "the dose makes the poison." Defendants had a viable safer and lower dose alternative in Depo-SubQ Provera

104 but failed to warn the medical community prescribing and administering Depo-Provera that Depo-SubQ Provera 104 was a safer alternative.

162. Moreover, the 150 mg Depo-Provera itself could have been a viable lower effective dose if it had simply been designed, approved, and sold to be administered subcutaneously, like Depo-SubQ Provera 104 is administered, instead of intramuscularly.

163. Injections given intramuscularly are well known to be absorbed by the body and taken up in the blood serum at much faster rates than injections given subcutaneously because of the much higher vascularization of deep muscle tissue compared to the dermis.

164. Studies have shown that 150 mg Depo-Provera administered intramuscularly causes a spike in blood serum levels of DMPA that is more than four (4) times higher than the peak blood serum concentration of DMPA when that same 150 mg Depo-Provera shot is given subcutaneously, and that very high intramuscular peak concentration persists for several days. In fact, 150 mg Depo-Provera administered subcutaneously has a remarkably similar pharmacokinetic profile to Depo-SubQ Provera 104.

165. Thus, there are two lower effective doses of Depo-Provera—both Depo-SubQ Provera 104, and the very same 150 mg Depo-Provera simply given subcutaneously instead of intramuscularly.

166. Defendants wantonly and willfully failed to apprise the public, including the FDA, the medical community, Plaintiff, and Plaintiff's physicians, of the greatly reduced risk of meningioma when injecting 150 mg Depo-Provera subcutaneously compared to the indicated method of intramuscular injection, because Defendants did not want to raise any alarms with respect to the safety profile of Depo-Provera and did not want to lose any of their lucrative market share for Depo-Provera.

167. Defendants knew or should have known that the Depo-Provera they developed, manufactured, labeled, marketed, sold, and/or promoted was defectively designed in that it posed a serious risk of severe and permanent intracranial meningioma-related injuries when injected intramuscularly.

168. Defendants have a continuing duty to design a product that is not unreasonably dangerous to users and to adequately understand, test, and monitor their product.

169. Defendants sold, marketed, and distributed a product that is unreasonably dangerous for its normal, intended, and foreseeable use.

170. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it was in an unreasonably dangerous and defective condition because it failed to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable to Defendants, posing a risk of serious and potentially debilitating intracranial meningioma to Plaintiff and other consumers.

171. The Depo-Provera administered to Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which it was sold.

172. The Depo-Provera administered to Plaintiff was in a condition not contemplated by Plaintiff in that it was unreasonably dangerous, posing a serious risk of permanent neurological and visual injuries.

173. Plaintiff, ordinary consumers, and prescribers would not expect a contraceptive drug designed, marketed, and labeled for contraception to cause intracranial meningioma.

174. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer or supplier, it had not been

adequately tested, was in an unreasonably dangerous and defective condition, provided an excessive dose of progestin for its purpose, and posed a risk of serious and potentially debilitating intracranial meningioma to Plaintiff and other consumers.

175. The Depo-Provera supplied to Plaintiff by Defendants was defective in design or formulation in that its effectiveness as a contraceptive did not outweigh the risks of serious and potentially debilitating intracranial meningioma posed by the drug. In light of the utility of the drug and the risk involved in its use, the design of Depo-Provera makes the product unreasonably dangerous.

176. The design defects render Depo-Provera more dangerous than other drugs and therapies designed for contraception and cause an unreasonable increased risk of injury, including but not limited to potentially debilitating intracranial meningioma and sequelae related thereto.

177. Defendants knew or should have known through testing, generally accepted scientific knowledge, advances in the field, published research in major peer-reviewed journals, or other means, that Depo-Provera created a risk of serious and potentially debilitating intracranial meningioma and sequelae related thereto.

178. Defendants knew or should have known that consumers, and Plaintiff specifically, would foreseeably and needlessly suffer injury as a result of Depo-Provera's defective design.

179. The defective design of Depo-Provera was a producing cause of Plaintiff's injuries.

180. As a direct and proximate result of Defendants' conduct and defective design, including inadequate testing and research, and the defective and dangerous nature of Depo-Provera, Plaintiff suffered bodily injuries that resulted in pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money,

and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

**COUNT III**
**NEGLIGENCE**

181. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

182. At all times relevant herein, it was the duty of Defendants to use reasonable care in the design, labeling, manufacturing, testing, marketing, distribution, and/or sale of Depo-Provera.

183. Defendants failed to exercise ordinary care in the labeling, design, manufacturing, testing, marketing, distribution, and/or sale of Depo-Provera in that Defendants knew or should have known that Depo-Provera created a high risk of unreasonable harm to Plaintiff and other users.

184. Defendants breached their duty of care to Plaintiff and her physicians in the testing, monitoring, and pharmacovigilance of Depo-Provera.

185. In disregard of their duty, Defendants committed one or more of the following negligent acts or omissions:

a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and distributing Depo-Provera without thorough and adequate pre- and post-market testing of the product;

b. Manufacturing, producing, promoting, advertising, formulating, creating, developing, designing, and distributing Depo-Provera while negligently and intentionally concealing and failing to disclose clinical data which demonstrated the risk of serious harm associated with the use of Depo-Provera;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Depo-Provera was safe for its intended use;

d. Failing to disclose and warn of the product defect to the regulatory agencies, the medical community, and consumers when Defendants knew and had reason to know that Depo-Provera was unreasonably unsafe and unfit for use by reason of the product's defect and risk of harm to its users;

e. Failing to warn Plaintiff, the medical and healthcare community, and consumers of the known and knowable risk of harm which was unreasonable, and that there were safer and effective alternative products available to Plaintiff and other consumers;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons to whom it was reasonably foreseeable would use Depo-Provera;

g. Advertising, marketing, and recommending the use of Depo-Provera, while concealing and failing to disclose or warn of the dangers known and knowable by Defendants to be connected with, and inherent in, the use of Depo-Provera;

h. Representing that Depo-Provera was safe for its intended use when in fact Defendants knew and should have known the product was not safe for its intended purpose;

i. Continuing to manufacture and sell Depo-Provera with the knowledge that Depo-Provera was unreasonably unsafe and dangerous;

j. Failing to use reasonable and prudent care in the design, research, testing, manufacture, and development of Depo-Provera so as to avoid the risk of serious harm associated with the use of Depo-Provera;

k. Failing to design and manufacture Depo-Provera so as to ensure the drug was at least as safe and effective as other similar products;

l. Failing to ensure the product was accompanied by proper and accurate warnings about monitoring for potential symptoms related to intracranial meningioma associated with the use of Depo-Provera;

m. Failing to ensure the product was accompanied by proper and accurate warnings about known and knowable adverse side effects associated with the use of Depo-Provera and that use of Depo-Provera created a high risk of severe injuries;

n. Failing to conduct adequate testing, including pre-clinical and clinical testing, and post-marketing surveillance to determine the safety of Depo-Provera; and

o. Failing to sell a product with the lowest effective dose knowing that there were safer lower effective dose formulations.

186. A reasonable manufacturer, designer, distributor, promoter, or seller under the same or similar circumstances would not have engaged in the aforementioned acts and omissions.

187. As a direct and proximate result of Defendants' negligent testing, monitoring, and pharmacovigilance of Depo-Provera, Defendants introduced a product that they knew or should have known would cause serious and permanent injuries related to the development of intracranial meningioma, and Plaintiff has been injured and has sustained severe and permanent pain, suffering, disability, and impairment, loss of enjoyment of life, and economic damages.

188. As a direct and proximate result of one or more of the above-stated negligent acts by Defendants, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money,

and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer losses in the future.

## COUNT IV
## NEGLIGENT FAILURE TO WARN

189. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

190. At all times material herein, Defendants had a duty to exercise reasonable care and had the duty of an expert in all aspects of warning and post-sale warning to assure the safety of Depo-Provera when used as intended or in a way that Defendants could reasonably have anticipated, and to assure that the consuming public, including Plaintiff and Plaintiff's physicians, obtained accurate information and adequate instructions for the safe use or non-use of Depo-Provera.

191. Defendants' duty of care was that which a reasonably careful designer, manufacturer, seller, importer, distributor, and/or supplier would use under like circumstances.

192. Defendants had a duty to warn Plaintiff, Plaintiff's physicians, and consumers of Depo-Provera's known and knowable dangers and serious side effects, including serious and potentially debilitating intracranial meningioma, as it was reasonably foreseeable to Defendants that Depo-Provera could cause such injuries.

193. At all times material herein, Defendants failed to exercise reasonable care and knew, or in the exercise of reasonable care should have known, that Depo-Provera had inadequate instructions and/or warnings.

194. Each of the following acts and omissions herein alleged was negligently and carelessly performed by Defendants, resulting in a breach of the duties set forth above. These acts and omissions include, but are not restricted to:

a. Failing to accompany their product with proper and adequate warnings, labeling, or instructions concerning the potentially dangerous, defective, unsafe, and deleterious propensity of Depo-Provera and of the risks associated with its use, including the severity and potentially irreversible nature of such adverse effects;

b. Disseminating information to Plaintiff and Plaintiff's physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiff;

c. Failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

d. Failing to adequately test and/or warn about the use of Depo-Provera, including without limitation the possible adverse side effects and health risks caused by the use of Depo-Provera;

e. Failing to adequately warn of the risk that Depo-Provera could cause the development of intracranial meningioma and sequelae related thereto;

f. Failing to adequately warn of the risk of serious and potentially irreversible injuries related to the development of intracranial meningioma, a brain tumor;

g. Failing to instruct patients, prescribers, and consumers of the need for monitoring when taking Depo-Provera for symptoms potentially related to the development of intracranial meningioma;

h. Failing to instruct patients, prescribers, and consumers of the need to discontinue Depo-Provera in the event of symptoms potentially related to the development of intracranial meningioma;

i. Failing to provide instructions on ways to safely use Depo-Provera to avoid injury, if any;

j. Failing to explain the mechanism, mode, and types of adverse events associated with Depo-Provera;

k. Failing to provide adequate training or information to medical care providers for appropriate use of Depo-Provera and patients taking Depo-Provera;

l. Representing to physicians, including but not limited to Plaintiff's prescribing physicians, that this drug was safe and effective for use;

m. Failing to warn that there is a safer feasible alternative with a lower effective dose of progestin; and

n. Failing to warn that the 150 mg dosage of progestin injected intramuscularly was an excessive and thus toxic dose capable of causing and/or substantially contributing to the development and growth of meningioma tumors.

195. Defendants knew or should have known of the risk and danger of serious bodily harm from the use of Depo-Provera but failed to provide an adequate warning to patients and prescribing physicians for the product, including Plaintiff and Plaintiff's prescribing physicians, despite knowing the product could cause serious injury.

196. Plaintiff was prescribed and used Depo-Provera for its intended purpose.

197. Plaintiff could not have known about the dangers and hazards presented by Depo-Provera.

198. The warnings given by Defendants were not accurate, clear, or complete and/or were ambiguous.

199. The warnings, or lack thereof, that were given by Defendants failed to properly warn prescribing physicians, including Plaintiff's prescribing physicians, of the known and knowable risk of serious and potentially irreversible injuries related to the development of intracranial meningioma, and failed to instruct prescribing physicians to test and monitor for the presence of the injuries and to discontinue use when symptoms of meningioma manifest.

200. Plaintiff and Plaintiff's prescribing physicians reasonably relied upon the skill, superior knowledge, and judgment of Defendants. Defendants had a continuing duty to warn Plaintiff and prescribing physicians of the dangers associated with Depo-Provera. Had Plaintiff received adequate warnings regarding the risks of Depo-Provera, Plaintiff would not have used the product.

201. Defendants' failure to exercise reasonable care in the dosing information, marketing, testing, and warnings of Depo-Provera was a proximate cause of Plaintiff's injuries and damages.

202. As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT V
## NEGLIGENT DESIGN DEFECT

203. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

204. At all times material herein, Defendants had a duty to exercise reasonable care and had the duty of an expert in all aspects of the design, formulation, manufacture, compounding, testing, inspection, packaging, labeling, distribution, marketing, promotion, advertising, sale, and research to assure the safety of Depo-Provera when used as intended or in a way that Defendants could reasonably have anticipated, and to assure that the consuming public, including Plaintiff and Plaintiff's physicians, obtained accurate information and adequate instructions for the safe use or non-use of Depo-Provera.

205. At all times material herein, Defendants failed to exercise reasonable care and the duty of an expert and knew, or in the exercise of reasonable care should have known, that Depo-Provera was not properly manufactured, designed, compounded, tested, inspected, packaged, distributed, marketed, advertised, formulated, promoted, examined, maintained, sold, or prepared, or a combination of these acts.

206. Each of the following acts and omissions herein alleged was negligently and carelessly performed by Defendants, resulting in a breach of the duties set forth above. These acts and omissions include, but are not restricted to negligently and carelessly:

a. Failing to use due care in developing, testing, designing, and manufacturing Depo-Provera so as to avoid the aforementioned risks to individuals when Depo-Provera was being used for contraception and other indications;

b. Failing to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Depo-Provera;

c. Designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendants knew or should have known could cause injury to Plaintiff; and

d. Failing to use due care in developing, testing, designing, and manufacturing Depo-Provera with the lowest effective dose as a safer alternative which clearly existed at all relevant times so as to avoid the aforementioned risks to individuals when high dose progestin Depo-Provera was being used for contraception.

207. Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Depo-Provera was a proximate cause of Plaintiff's injuries and damages.

208. As a direct and proximate result of Defendants' negligence, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT VI
## NEGLIGENT MISREPRESENTATION

209. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

210. At all relevant times, Defendants negligently provided Plaintiff, her healthcare providers, and the general medical community with false or incorrect information, or omitted or failed to disclose material information, concerning Depo-Provera, including but not limited to misrepresentations regarding the safety and known risks of Depo-Provera.

211. Defendants made these representations in the course of their business and in a transaction in which they had a pecuniary interest, namely the sale of Depo-Provera.

212. The information distributed by Defendants to the public, the medical community, Plaintiff, and her Prescribing and Administering Health Care Providers, including advertising campaigns, labeling materials, print advertisements, and commercial media, was false and misleading and contained omissions and concealment of truth about the dangers of Depo-Provera.

213. Defendants' intent and purpose in making these misrepresentations was to deceive the public and the medical community, including Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers, to falsely assure them of the quality of Depo-Provera, and to induce the public and medical community to request, recommend, purchase, and prescribe Depo-Provera.

214. Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff, her Prescribing and Administering Health Care Providers, and the public, the known risks of Depo-Provera, including its propensity to cause intracranial meningioma and sequelae related thereto.

215. Defendants made continued omissions in the Depo-Provera labeling, including promoting it as safe and effective while failing to warn of its propensity to cause intracranial meningioma and sequelae related thereto.

216. Defendants made additional misrepresentations beyond the product labeling by representing Depo-Provera as safe and effective for contraception and other indications with only minimal risks.

217. Defendants misrepresented and overstated the benefits of Depo-Provera to Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and the medical community

without properly advising of the known risks associated with intracranial meningioma and sequelae related thereto.

218. Defendants misrepresented and overstated that the Depo-Provera dosage was needed to protect against pregnancy when Defendants knew that a safer alternative existed with forty-six (46) fewer milligrams per dose of the powerful progestin being administered quarterly to women, and when Defendants could have warned and recommended usage of Depo-SubQ Provera 104 instead.

219. Defendants failed to exercise reasonable care or competence in obtaining or communicating the information described above.

220. In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers were induced to, and did, use Depo-Provera, thereby causing Plaintiff to endure severe and permanent injuries.

221. In reliance upon the false and negligent misrepresentations and omissions made by Defendants, Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers were unable to associate the injuries sustained by Plaintiff with her Depo-Provera use, and were therefore unable to provide adequate treatment. Defendants knew or should have known that Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and the general medical community did not have the ability to determine the true facts which were intentionally and/or negligently concealed and misrepresented by Defendants.

222. Plaintiff and her Prescribing and Administering Health Care Providers would not have used or prescribed Depo-Provera had the true facts not been concealed by Defendants.

223. Defendants had sole access to many of the material facts concerning the defective nature of Depo-Provera and its propensity to cause serious and dangerous side effects.

224. At the time Plaintiff was prescribed and administered Depo-Provera, Plaintiff and her Prescribing and Administering Health Care Providers were unaware of Defendants' negligent misrepresentations and omissions.

225. Plaintiff and Plaintiff's Prescribing and Administering Health Care Providers justifiably relied upon the misrepresentations and omissions made by Defendants, where the concealed and misrepresented facts were critical to understanding the true dangers inherent in the use of Depo-Provera.

226. As a direct and proximate result of reliance upon Defendants' negligent misrepresentations, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## COUNT VII
## FRAUDULENT MISREPRESENTATION AND FRAUDULENT CONCEALMENT

227. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

228. Defendants falsely and fraudulently represented, and continue to represent, to the medical and healthcare community, Plaintiff and her Prescribing and Administering Health Care Providers, and the public in general, that Depo-Provera has been appropriately tested and was found to be safe and effective.

229. At all times material herein, Defendants misrepresented to consumers and physicians, including Plaintiff and Plaintiff's physicians and the public in general, that Depo-Provera is safe for use as a contraceptive and for other indications.

230. Defendants knew or should have known of the falsity of such representations to consumers, physicians, and the public in general, since Depo-Provera is far from the only contraceptive approved by the FDA and is not the only contraception option. Nevertheless, Defendants' marketing of Depo-Provera falsely represented Depo-Provera to be a safe and effective contraceptive option with no increased risk of intracranial meningioma and sequelae related thereto.

231. The representations were, in fact, false. When Defendants made these representations, they knew and/or had reason to know that those representations were false, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of Depo-Provera.

232. Prior to Plaintiff's use of Depo-Provera, Defendants knew or should have known of adverse event reports indicating the development of intracranial meningioma in individuals who had taken Depo-Provera.

233. These representations were made by Defendants with the intent of defrauding and deceiving the medical community, Plaintiff, and the public, and of inducing the medical community, Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and/or the public to recommend, prescribe, dispense, and purchase Depo-Provera for use as a contraceptive and for other treatment indications, while concealing the drug's known propensity to cause serious and debilitating intracranial meningioma and sequelae related thereto.

234. Despite the fact that Defendants knew or should have known of Depo-Provera's propensity to cause serious and potentially debilitating injuries due to the development of intracranial meningioma and sequelae related thereto, the label did not contain any of this information in the "Warnings" section. In fact, the label for Depo-Provera has been updated at least a dozen times over the past 20 years, yet at no point did Defendants provide any of the foregoing information in the "Warnings" section. To date, the Depo-Provera label still does not include adequate warnings that indicate the dangers of intracranial meningioma and sequelae related thereto after using Depo-Provera.

235. In representations to Plaintiff and/or to her healthcare providers, including Plaintiff's prescribing physicians, Defendants fraudulently stated that Depo-Provera was safe and omitted warnings related to intracranial meningioma.

236. In representations to Plaintiff and/or to her Prescribing and Administering Health Care Providers, Defendants fraudulently stated that Depo-Provera was safe and concealed and intentionally omitted material information from the Depo-Provera product labeling in existence at the time Plaintiff was prescribed Depo-Provera in or about 2003.

237. Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of Depo-Provera, including but not limited to its propensity to cause the development of intracranial meningioma and, consequently, its ability to cause debilitating and permanent injuries.

238. Defendants had a duty when disseminating information to the public to disseminate truthful information, and a parallel duty not to deceive the public, Plaintiff, and/or her physicians.

239. Defendants knew or had reason to know of the dangerous side effects of Depo-Provera as a result of information from case studies, clinical trials, literature, and adverse event

reports available to Defendants at the time of the development and sale of Depo-Provera, as well as at the time of Plaintiff's prescription.

240. Defendants' concealment and omissions of material facts concerning the safety of Depo-Provera were made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff, Plaintiff's physicians, surgeons, and healthcare providers, and to induce them to purchase, prescribe, and/or use the drug.

241. At the time these representations were made by Defendants, and at the time Plaintiff and/or her Prescribing and Administering Health Care Providers used Depo-Provera, Plaintiff and/or her Prescribing and Administering Health Care Providers were unaware of the falsity of these representations.

242. In reliance upon these false representations, Plaintiff was induced to, and did, use Depo-Provera, thereby causing severe, debilitating, and potentially permanent personal injuries and damages to Plaintiff. Defendants knew or had reason to know that Plaintiff had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding the use of Depo-Provera as described in detail herein.

243. In comporting with the standard of care for prescribing physicians, Plaintiff's prescribing physicians relied on the labeling for Depo-Provera in existence at the date of prescription that included the aforementioned fraudulent statements and omissions.

244. These representations made by Defendants were false when made and/or were made with the pretense of actual knowledge when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

245. Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks, nor did Plaintiff discover the false representations and omissions of Defendants, nor

could Plaintiff with reasonable diligence have discovered the true facts about Defendants' misrepresentations at the time when Depo-Provera was prescribed to her.

246. As a direct and proximate result of reliance upon Defendants' fraudulent misrepresentations and concealment, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, expense of medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and other economic losses. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

247. Defendants have engaged in willful, malicious conduct and/or conduct so careless that it demonstrates a wanton disregard for the safety of others, including Plaintiff, such that the imposition of exemplary damages is warranted here.

## COUNT VIII
## BREACH OF EXPRESS WARRANTY

248. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

249. At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera, and placed it into the stream of commerce in a defective and unreasonably dangerous condition.

250. Defendants expressly warranted to Plaintiff, Plaintiff's Prescribing and Administering Health Care Providers, and the general public, by and through Defendants and/or their authorized agents or sales representatives, in publications, labeling, the internet, and other

communications intended for physicians, patients, Plaintiff, and the general public, that Depo-Provera was safe, effective, fit, and proper for its intended use.

251. These affirmations of fact and promises became part of the basis of the bargain, creating express warranties that Depo-Provera would conform to those affirmations and promises. See Tex. Bus. & Com. Code § 2.313.

252. Depo-Provera materially failed to conform to those representations made by Defendants, in package inserts and otherwise, concerning the properties and effects of Depo-Provera, which Plaintiff obtained and received via intramuscular injection in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Depo-Provera as sold to Plaintiff.

253. Defendants expressly warranted that Depo-Provera was safe and well tolerated. However, Defendants did not have adequate proof upon which to base such representations and, in fact, knew or should have known that Depo-Provera was dangerous to the well-being of Plaintiff and others.

254. Depo-Provera does not conform to those express representations because it is defective, is not safe, and has serious adverse side effects.

255. Plaintiff and Plaintiff's physicians justifiably relied on Defendants' representations regarding the safety of Depo-Provera, and Defendants' representations became part of the basis of the bargain.

256. Plaintiff's Prescribing and Administering Health Care Providers justifiably relied on Defendants' representations through Defendants' marketing and sales representatives in

deciding to prescribe Depo-Provera over other alternative treatments on the market, and Plaintiff justifiably relied on Defendants' representations in deciding to obtain and use the drug.

257. Plaintiff received Depo-Provera without knowing that the drug is not safe and well tolerated, and that Depo-Provera instead causes significant and irreparable damage through the development of debilitating intracranial meningioma.

258. Plaintiff provided Defendants with reasonable notice of the breach, including by the filing of this Complaint. Any further notice requirement is excused, waived, or satisfied because Defendants had actual knowledge of the defect and of the breach.

259. As a direct and proximate result of Defendants' breaches of warranty, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, past and future medical care and treatment, loss of earnings, loss of ability to earn money, and other economic losses and damages. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

**COUNT IX**
**BREACH OF IMPLIED WARRANTY**

260. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

261. At all relevant times herein, Defendants engaged in the business of researching, testing, developing, manufacturing, labeling, marketing, selling, inspecting, handling, storing, distributing, and/or promoting Depo-Provera, and placed it into the stream of commerce in a defective and unreasonably dangerous condition.

262. Defendants were the sellers of Depo-Provera and sold Depo-Provera to be used for contraception or to treat endometriosis, among other indications. Plaintiff was prescribed and received Depo-Provera for these intended purposes.

263. When Depo-Provera was prescribed by Plaintiff's physicians and administered to Plaintiff, the product was being prescribed and used for the ordinary purpose for which it was intended.

264. Defendants impliedly warranted their Depo-Provera product, which they manufactured and/or distributed and sold, and which Plaintiff received, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold. See Tex. Bus. & Com. Code § 2.314.

265. Defendants breached their implied warranties because the Depo-Provera sold for administration to Plaintiff was not fit for its ordinary purpose as a contraceptive or to treat endometriosis safely and effectively, among other uses.

266. Depo-Provera would not pass without objection in the trade; is not of fair average quality; is not fit for the ordinary purposes for which the product is used; was not adequately contained, packaged, and labeled; and fails to conform to the promises or affirmations of fact made on the container or label.

267. Defendants' breach of their implied warranties resulted in the intramuscular administration of the unreasonably dangerous and defective product into Plaintiff, which placed Plaintiff's health and safety at risk and resulted in the damages alleged herein.

268. Plaintiff provided Defendants with reasonable notice of the breach, including by the filing of this Complaint. Any further notice requirement is excused, waived, or satisfied because Defendants had actual knowledge of the defect and of the breach.

269. As a direct and proximate result of Defendants' breaches of warranty, Plaintiff suffered bodily injuries and resulting pain and suffering, disability, disfigurement, physical impairment, mental anguish, loss of capacity for the enjoyment of life, past and future medical care and treatment, loss of earnings, loss of ability to earn money, and other economic losses and damages. The losses are either permanent or continuing, and Plaintiff will suffer the losses in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Award Plaintiff compensatory and exemplary damages in an amount to be determined at trial, including but not limited to:
    a. General damages for past and future physical pain and suffering, mental anguish, physical impairment, disfigurement, inconvenience, and loss of the enjoyment of life;
    b. Special damages, including all past and future medical and incidental expenses, and loss of earnings and earning capacity;
2. Award prejudgment and post-judgment interest as permitted by law;
3. Award reasonable attorneys' fees and costs of court, as provided for by law; and
4. Grant such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all Counts and as to all issues so triable.

DATED: July 27, 2026.

Respectfully submitted,

**RILEY LAW GROUP, PLLC**
*/s/ Brandon Scott Riley*
Brandon Scott Riley
Texas Bar No. 24120612
S.D. Tex. Bar No. 3980925
2001 Timberloch Place Suite 500
The Woodlands, Texas 77380
Tel. (832) 856-5707
Email: Brandon@Riley.Law
ATTORNEY FOR PLAINTIFF FELICIA LYNN GUEL